THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALFREDO VENTURA, Appellant.

First Department, July 14, 1988

APPEARANCES OF COUNSEL

*Donald J. Siewert* of counsel *(Mark Dwyer* with him on the

brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Noah Lipman* of counsel *(David Segal,* attorney), for appellant.

## OPINION OF THE COURT

CARRO, J.

In 1975, in a brief Per Curiam opinion *(People v Williams,* 36 NY2d 829, *cert denied* 423 US 873), the Court of Appeals, under the "circumstances" of that case, upheld the defendant's waiver of his right to appeal an adverse suppression ruling which was exacted by the prosecutor as a condition to his plea. Since then, our fellow Appellate Division courts, evidently perceiving *Williams* as having given prosecutors *carte blanche* to condition pleas to the waiver of appellate review of suppression rulings, have given effect to such waivers, as long as they are shown to have been entered knowingly and voluntarily. *(See, e.g., People v Jenkins,* 118 AD2d 731 [2d Dept]; *People v Pescatore,* 102 AD2d 834 [2d Dept]; *People v Jandrew,* 101 AD2d 90 [3d Dept]; *People v Durant,* 101 AD2d 1008 [4th Dept]; *People v Santana,* 99 AD2d 586 [3d Dept]; *People v Di Orio,* 99 AD2d 593, 594 [3d Dept]; *People v Gray,* 75 AD2d 826 [2d Dept]; *People v Juliano,* 74 AD2d 881 [2d Dept].)

This court has yet to rule definitively on the validity of waivers of the right to appeal suppression rulings. In two cases which presented this issue, *People v De Santis* (118 AD2d 1050, *lv denied* 67 NY2d 941) and *People v Barnes* (133 AD2d 550, *lv denied* 70 NY2d 873), this court affirmed the judgments without opinion. These decisions, however, cannot be interpreted as *sub silentio* blanket approvals of conditioning pleas to waivers of appellate review. To the contrary, our recent decision in *People v Velazquez* (140 AD2d 179) clearly demonstrates the unresolved nature of this issue in this judicial Department. In *Velazquez,* a majority of the court specifically declined to reach the question of the validity of the waiver, a plain admission that there is some concern in this area. Two Justices dissented, concluding that to give effect to the waiver in *Velazquez* would be inconsistent with the facts in *People v Williams (supra)* and *People v Esajerre* (35 NY2d 463), another decision often cited for the validity of waivers of appellate review of suppression issues.

I believe the approach of the dissenters in *Velazquez (supra)*

is correct, and I would elaborate. The time is ripe to take a hard look at whether the important public policy of this State to provide defendants at least one level of appellate review is offended by a prosecutorial practice of conditioning pleas to waivers which purportedly insulate suppression rulings from appellate review, divest this court of its intended role in correcting errors of constitutional magnitude, and do so without furthering, in the least, any legitimate State interest. The facts surrounding the waiver herein make a compelling case for the need to establish public policy limits to conditioning pleas to waivers of appellate review. Establishing such limits is the work of this court, and the purpose of this opinion.

Early in the afternoon of December 17, 1986, Police Officers Diaz and Atkins were patrolling in uniform in a marked police car on Audabon Avenue in Manhattan, an area described by Diaz as "drug prone."[1] As Atkins drove southbound, Diaz noticed two men, one of whom was defendant, walking in a northerly direction, talking to each other. At that point, Atkins, without specifying to which of the two men he was referring, said "that guy has a gun." Erroneously assuming that Atkins was referring to defendant, Diaz turned to defendant and observed that he was "playing inside his jacket," or seemingly "fixing something" "inside his inner jacket pocket." Diaz testified that he thought defendant might be adjusting a holster. The officers decided to park their car and follow the two men, who had entered a locked building and were in the vestibule area.

As the officers reached the building, 1 of 3 elderly men who were also in the vestibule area opened the outside door for them. With hands on their guns, the officers entered the vestibule and observed defendant with a set of keys "fidgeting or trying to open the door" which led from the vestibule to the building's interior. The 6-foot-4, 270-pound Diaz approached defendant and positioned himself to defendant's right. Defendant peered over his shoulder at Diaz but would not look "directly" at Diaz. Diaz noticed that defendant appeared "nervous" and that his hands were "trembling" as he fidgeted with the door. Diaz asked defendant whether he lived in the building. Defendant answered that he did. Although observing that defendant did have keys, Diaz decided to ask again. This time, defendant replied "No."

---

1. The facts, as summarized herein, were developed at the pretrial suppression hearing.

Defendant, now facing and talking to Diaz, was making motions with his hands towards his chest. Diaz testified that defendant's nervousness made him nervous. When Diaz noticed a bulge on the left side of defendant's zippered jacket, without making any inquiry, he placed his hand over the bulge, felt that it was "hard" and immediately ordered defendant to open his jacket. Defendant complied, and Diaz reached in and retrieved from the left inside pocket a brown paper bag containing two "zip-lock" plastic bags containing nine ounces of cocaine.[2] The smaller bag was wrapped in toilet tissue.

Defendant disputed Diaz' account in several respects. He testified that his aunt lived in the building and had given him a key, since he visited regularly. He was having trouble opening the door when the officers arrived, because the lock was damaged. Defendant claims to have told the police officers that he did not live in the building and denied waving his hands around as he spoke. He also differed with Officer Diaz as to how the drugs were seized. He testified that he was carrying a small bag wrapped in toilet tissue in the left inside jacket pocket and a larger brown paper bag inside the right side of the jacket. He testified that no bulge was visible on the left side of the jacket, but that there was a bulge on the right side. Denying knowledge of the contents of the brown paper bag, defendant explained that someone had given it to him to deliver. Defendant also denied being patted first and testified that the officer turned him around, placed him faceup against the wall and searched him.

The hearing court credited Diaz' testimony and concluded that his conduct in touching the bulge and ordering defendant to open his jacket was reasonable under the circumstances. The court denied suppression.

At the close of the hearing, defendant's counsel disclosed the fact that prior to the hearing the People had offered defendant a plea to second-degree possession with a sentence promise of three years to life, but only if he would withdraw his motion to suppress. The People had further advised defendant that should he lose the motion, the sentence offer would be doubled to six years to life.

■ At the plea allocution itself, defense counsel again protested the fact that the sentence promise had been doubled, but omitted mentioning that a condition of the new plea

---

**2.** Defendant was indicted for criminal possession of a controlled substance in the first and third degrees.

offer was that defendant waive appellate review of the suppression ruling. When the court inquired about this omission, counsel responded: "I didn't state that because I wanted the defendant to state that on the record * * * The defendant has no other alternative but to accept that condition. I've advised him of that." The court then asked defendant whether he understood this condition, to which defendant relied "Yes." Defendant was subsequently convicted and sentenced as promised. Defendant now appeals, seeking a reversal of the suppression ruling. The People argue that this issue is not properly before us, since defendant waived his right to appeal the ruling. We reach this issue in the interest of justice and hold that under the facts of this case, this waiver is invalid.

Generally, all rights to which a person is legally entitled are waivable "whether secured to him by contract, conferred upon him by statute or guaranteed him by the Constitution". *(People ex rel. McLaughlin v Board of Police Commrs., 174 NY 450, 456.)* Such waivers, however, whether in the context of civil or criminal cases, are susceptible to challenge if not knowingly and voluntarily entered, if the product of fraud, duress or coercion, or if they transgress public policy. *(See, Hadden v Consolidated Edison Co., 45 NY2d 466, 469; People v Blakley, 34 NY2d 311, 313; People v White, 32 NY2d 393, 399-400.)*[3] When the waiver involves a right as important as the right of appellate review, this court, as the court of last resort in most cases, and, certainly, as the court of last resort on the facts, has an especially compelling duty to examine the record to assure itself of the validity of such a waiver. Moreover, when the waiver occurs in the inherently coercive atmosphere of plea bargaining *(People v White, supra, 32 NY2d, at 400),* this court, in the interest of justice, has an equally compelling duty to act as a check against potential abuses of prosecutorial powers.

Without a doubt, there are individual cases which present sound reasons for a prosecutor to condition a plea to the waiver of appellate review. The prime case in point is *People v Williams* (36 NY2d 829, *supra).* What is most important about *Williams,* yet seemingly largely ignored except for the Ve-

3. In *People v Bourne* (139 AD2d 210, 212 [1988]) a majority of the court held that despite defendant's waiver of the right to appeal his judgment of conviction after a plea of guilty, that waiver was ineffective to prevent defendant from invoking the exclusive power of this court to review and modify sentences in its discretion in the interest of justice. This constituted an independent basis for disregarding the waiver therein.

lazquez dissent, is the court's observation that the prosecutor had a "justification for imposing this condition" *(supra,* 36 NY2d, at 830). The People had been ready to proceed to trial on an already old case and feared they "would be prejudiced", if they had to try a stale case upon an appellate reversal of the suppression ruling, when "witnesses could be unavailable" *(supra,* at 830).

Evidently, the statements claimed by defendant Williams to warrant suppression were not absolutely essential to the People's case, and their suppression would not terminate the matter. There was, therefore, a legitimate reason for the prosecutor to exact a waiver in exchange for a plea, and the agreement was of mutual benefit to both the People and the defendant. The People were assured of the finality of the plea and, most importantly, that they would not have to try a stale case. Defendant, uncertain of his chances at trial even without the statements, had a practical reason, as well, to agree to the waiver in return for the plea to a reduced offense. There was a genuine and legitimate mutuality of interest in the waiver. The waiver, in other words, was a proper bargaining element in negotiating the plea.

*People v Esajerre* (35 NY2d 463, *supra)* which also gave effect to a plea conditioned on a waiver, involved inapposite facts and the waiver of a different right. Its ruling, therefore, is inapplicable to this case. In *Esajerre* the parties negotiated a plea and an associated waiver prior to any suppression ruling. After each side weighed the relevant evidence on the suppression motion from their respective vantage points, they agreed to waive the conclusion of the hearing and a suppression ruling in exchange for a mutually favorable plea. Each party surrendered its chance of obtaining a ruling in its favor and eliminated the risk of losing. In any event, since there was no *order* denying suppression, the plea of guilty automatically operated as a forfeiture of the right to seek appellate review of the suppression issue. *(See, People v Thomas,* 74 AD2d 317, esp 319-322, *affd* 53 NY2d 338; CPL 710.70 [2].) Consequently, *Esajerre* has no application to this case. *(Williams (supra),* however, does, as do a number of decisions involving the waiver of appeals in civil cases.

While the Court of Appeals in *Williams (supra)* spoke of the People's "justification" for the waiver, in civil cases the Court of Appeals has required, not dissimilarly, that an agreement not to appeal be based upon some "consideration". In *Ogdensburgh & Lake Champlain R. R. Co. v Vermont & Canada*

*R. R. Co.* (63 NY 176, 180) the court ruled that the right to appeal, though waivable, is nevertheless "a valuable right and the agreement to surrender it must be based upon some consideration or the facts must estop the party from exercising it." In *People v Stephens* (52 NY 306, 310) the court found sufficient consideration in the fact that in exchange for his consent not to appeal, the State Attorney-General procured from the adverse party a waiver of all claims for costs. Likewise, in *Townsend v Masterson, Smith & Sinclair Stone Dressing Co.* (15 NY 587) the court enforced a waiver of the right to appeal where both parties to the litigation, each of whom disputed certain rulings, mutually agreed to waive appellate review *(supra,* at 589-590).

An equivalent for the "consideration" that public policy requires before validating a waiver of appellate review in civil cases must certainly be required as well in criminal cases. Indeed, "[o]ur State has always regarded the right to appellate review in criminal matters [as] an integral part of our judicial system and treated it as such." *(People v Pride,* 3 NY2d 545, 549.) In recognition of the importance of this right, "it has been the consistent policy of our courts to preserve and promote that right as an effective, if imperfect, safeguard against impropriety or error in the trial of causes" *(supra,* at 549). Thus, the public policy of this State requires that before the People can condition a plea to the defendant's waiver of his right to appellate review, it must advance some legitimate State interest, as was advanced in *Williams (supra),* sufficient to justify requiring the waiver of such an important right.

As "the surrogates of the State's responsibility" in preserving the right of appellate review *(People v Montgomery,* 24 NY2d 130, 133; *see also, People v Pride,* 3 NY2d 545, 549, *supra),* the courts of this State have often, and without timidity, guarded and preserved this important right against threats to render it nugatory, whether emanating from the Legislature *(People v Pollenz,* 67 NY2d 264, 268), the conduct or neglect of counsel *(People v Montgomery, supra,* 24 NY2d, at 132-133; *People v De Renzzio,* 14 NY2d 732, 733; *People v Adams,* 12 NY2d 417, 420-421; *People v Coe,* 16 AD2d 876), the acts of prison officials *(People v Hairston,* 10 NY2d 92, 94), or defendant's own mental incapacity *(People v Hill,* 8 NY2d 935, 936). Our duty extends as well to protect against autocratic attempts by the prosecutorial branch to insulate convictions from appellate review when no legitimate State purpose is being served.

In the case before us, one may search the record in vain for any legitimate State interest which would warrant precluding defendant from exercising his right to appeal the suppression ruling. This prosecution stands or falls on a single question: the constitutionality of the seizure. If the evidence is suppressed, the matter must be dismissed. Evidently influenced by the strength of defendant's constitutional claim, the prosecutor had initially offered him a generous plea to a reduced offense with a promise of the minimum sentence, three years to life, provided, however, that defendant withdraw his *Mapp* motion.

As difficult a choice as this must have been, particularly knowing in advance that the People were going to double the sentence promise if suppression were denied, defendant, nevertheless, rejected the offer. Once the court denied suppression of the cocaine, defendant, who possessed no realistic trial defense, had as his only remaining option to plead guilty and preserve the issue for appellate review. He certainly had no reason to wish to waive appellate review. The People, wishing to spare the State the expense of an unnecessary trial, did still have a legitimate reason at this point to offer a reduced plea in return for defendant's admission of guilt. To save the expense of unnecessary trials, particularly when the only issue in a case is a suppression issue, is precisely what the Legislature intended in enacting CPL 710.70 (2) to provide that a defendant who pleads guilty may still seek appellate review of a suppression ruling. *(See, People v Williams,* 43 AD2d 884, *affd* 36 NY2d 829, *supra.)* However, the nonnecessity in this case of a trial after an appellate reversal is precisely why there is no legitimate rationale to the People's additional requirement of a waiver. The waiver was not a valid bargaining element in the negotiation of this plea.

In marked contrast to the *Williams* case *(supra),* there can be no prejudice to the People in permitting defendant to appeal this suppression ruling. If we affirm, both the suppression ruling and plea conviction stand intact. If we reverse and grant suppression, the indictment will be dismissed. No further proceeding will occur. What appropriate interest, then, do the People have, in the circumstances presented, to make their consent to the plea depend on defendant's agreement to waive his right to appellate review of the suppression ruling? What harm or prejudice are they seeking to avoid? It cannot be to spare the State the cost of providing appellate review to a convicted defendant, for that would be offensive to the

public policy of this State, which is committed to providing the right of appellate review and bearing the cost. *(See, People v Rivera,* 39 NY2d 519, 522; *People v Montgomery, supra,* 24 NY2d, at 132-133.)

Neither can the prosecutor exact a waiver of appellate review and deprive defendant of any opportunity to seek correction of a possibly infirm conviction, for no better reason than that a person who possesses contraband should be convicted and that conviction should remain undisturbed, unreviewed, and unassailable, no matter the constitutional violations which preceded it. Such judgments are not for a prosecutor to make. The powers of a prosecutor may indeed be broad *(People v Zimmer,* 51 NY2d 390, 394) but not so broad and limitless as to include the power to exact waivers of as fundamental a right as the right to appeal without first advancing a *legitimate* State interest. There is no legitimate State interest in preserving an unjust conviction for the sake of the conviction alone. And it is for us, not the prosecutor, to determine on an appeal whether a conviction is unjust.

Sadly, it is sometimes necessary to remind prosecutors of the delicate role they play in the criminal justice system: "Unlike other participants in the traditional common-law adversarial process, whose more singular function is to protect and advance the rights of one side, a District Attorney carries an additional and more sensitive burden. It is not enough for him to be intent on the prosecution of his case. Granted that his paramount obligation is to the public, he must never lose sight of the fact that a defendant, as an integral member of the body politic, is entitled to a full measure of fairness. Put another way, his mission is not so much to convict as it is to achieve a just result" *(People v Zimmer, supra,* 51 NY2d, at 393). The just result here is to invalidate this waiver as serving no legitimate State purpose.

■ Not only is the waiver itself contrary to public policy because it fails to serve any legitimate State interest, but the coercive manner in which it was extracted also requires its invalidation. Defendant had already assumed a big risk proceeding with his suppression hearing having been warned by the prosecutor that she would double the sentence promise from three years to life to six years to life, if defendant lost the motion. How grossly unfair, then, and what an offensive blow to defendant's ability to calculate the risks attendant upon a decision either to proceed with a suppression hearing or accept a generous plea, to discover at the conclusion of the

hearing that even the doubled offer of six years to life was conditioned on defendant's waiver of his suppression issue.

This court may not excuse such punitive and coercive plea bargaining with a glib statement that defendant could have rejected the plea offer. The reality is that there are instances, and this case is one, where "defendants have no practical alternative to accepting the plea bargain proposed by prosecutors" *(People v Gottfried,* 94 AD2d 632, 634 [Sandler J., concurring]). When the entire prosecution rests on evidence ruled admissible despite defendant's meritorious constitutional challenge and there is no point in defendant proceeding to trial, to condition a plea to the waiver of the right to appeal the suppression ruling is inherently coercive and infects the entire plea bargain, no matter how generous the plea is otherwise. *(See, People v Blakley, supra,* 34 NY2d, at 313; *People v White, supra,* 32 NY2d, at 400.)

Offering a plea to a reduced offense may, in truth, be a matter of grace with the prosecutor's office, but, once initiated, the plea bargaining process *must* be fair. *(People v White, supra,* at 400.) It appears that fairness and justice were laid by the wayside in this case in the blind pursuit to preclude defendant from arguing the merits of his constitutional claim. What Judge Breitel said some years ago in *People v Flowers* (30 NY2d 315, 319) is poignantly applicable herein: "The State is not so short of grist for its criminal mill that it must absorb convictions obtained in the * * * circumstances present here."

█ Not only must this court invalidate this waiver, but upon a review of the merits of defendant's suppression claim, it should also grant suppression. Officer Diaz lacked a sufficient basis to suspect that defendant was armed, so as to justify the pat down and search of his jacket. A police officer is authorized to stop and detain a person forcibly when the officer's information, observations and the attendant circumstances are sufficient to support a reasonable suspicion that the person has committed, is committing or is about to commit a crime. *(People v De Bour,* 40 NY2d 210, 223; *People v Bond,* 116 AD2d 28, 30, *lv denied* 68 NY2d 767.) In the course of an authorized investigatory stop, the officer may also conduct a limited, protective pat down or frisk of the detainee, if he reasonably suspects he is in danger of physical injury from the person *(supra).*

Officer Diaz' observations and the attendant circumstances did not warrant a reasonable suspicion that defendant was

armed and posed a danger to him. The predicate for deciding to follow defendant and his companion was Diaz' observation of what can only be termed innocuous behavior. Defendant and his companion were walking along the street in a normal gait, in broad daylight, making no menacing or furtive gestures, when Diaz observed defendant "fixing something" under his jacket. Although Diaz testified that he thought defendant could be adjusting a holster, this conclusion was absolute speculation, since Diaz never observed any part of or the shape of a holster and had no independent information that men with guns were in the vicinity. One could just as well have guessed that defendant was arranging his clothing, a wallet or some other innocuous item. The fact remains that any conclusion would still be based on mere guess.

Since it is axiomatic that "innocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand" *(People v De Bour, supra,* 40 NY2d, at 216), at best, all Diaz was authorized to do was to continue to observe defendant and exercise his common-law right to make inquiry *(supra,* at 213). Accordingly, there was no impropriety in entering the vestibule of the building to further observe defendant.

What Diaz observed in the vestibule, defendant's nervousness and the fidgeting with the keys, was also susceptible of innocent interpretation. Even the most innocent of persons could become nervous and lose composure at the sudden appearance of a 6-foot-4, 270-pound police officer with his hand on his gun. *(See, People v Rice,* 65 AD2d 132, 134.) Additionally, defendant's falsehood about living in the building could also hardly have triggered heightened suspicion that he was armed. The lie about living in the building had nothing to do with whether or not defendant was armed. Also, since he had a key to the door and there were others in the vestibule, Diaz could not have reasonably suspected that criminality, for instance, a burglary, was afoot. On this point, it is well worth a reminder that "even a suspect's obvious falsehoods cannot justify further police intrusion without some other conduct which provides probable cause or a reasonable fear that the officer is in danger of physical injury." *(People v Meachem,* 115 AD2d 370, 372; *see also, People v McNatt,* 65 NY2d 1046, 1048; *People v Cornelius,* 113 AD2d 666, 670.)

A consideration of the facts in their totality, defendant's nervousness, his irrelevant falsehood, and finally the observation of the shapeless bulge in the jacket, still leads to the

conclusion that there was an insufficient predicate to warrant the pat down and the request that defendant open his jacket. To determine whether a police officer has properly placed his hand on the person of another to ascertain the nature of a suspicious bulge, a court must ask: "[w]as there proof of a describable object or of describable conduct that provides a reasonable basis for the police officer's belief that the defendant had a gun in his possession?" *(People v Prochilo,* 41 NY2d 759, 761; *see also, Sibron v New York,* 392 US 40, 64.) Clearly, there was no proof of a describable object that could have been taken to be a gun. Diaz did not see an outline of a gun, nor any part of what appeared to be a gun, and simply could not tell what the object was which formed the nondescript bulge. This is hardly surprising, since the object turned out to be a bag containing nine ounces of cocaine.

Diaz' conduct in placing his hand on the bulge must, then, be justified by some describable conduct of defendant which reasonably lead Diaz to conclude that the bulge was evidence of a gun. A defendant's nervousness combined with the presence of a bulge, is not, however, sufficient, as the Court of Appeals determined in one of the trilogy of cases comprising *People v Prochilo (supra).* In the *Bernard* case (41 NY2d, at 762-763), two police officers were approached by two persons, one a known pimp and the other, defendant. Defendant appeared nervous, was slouched over and kept his hands in the pocket of his long coat in an unnatural manner, until the officer asked him to remove his hand from the pocket. As defendant did so, a "heavy object" slid down the pocket. Although agreeing that the officers in being approached in this manner had reason to be apprehensive, the court ruled that the search of the pocket was nevertheless impermissible, because "there was nothing in defendant's standing behind the pimp, in his nervousness or his slouched stature, or the fact that he had his hands in his coat pockets and removed them very slowly when requested to do so, or that a heavy object slid against the material of defendant's pocket which can be said to be reasonably referable to or indicative of the presence of a revolver" *(supra,* at 763).

If the totality of circumstances did not warrant a search in *Bernard (supra),* they certainly cannot here, where there were not even the additionally disconcerting factors present in *Bernard* of the object appearing heavy and the defendant having his hand in his pocket in an unusual posture. The facts herein, therefore, did not warrant a reasonable suspicion of a

gun and Diaz' action in placing his hand on the bulge was impermissible. Since, in fact, there was no gun, but rather a paper bag containing cocaine, Diaz' inability to conclude anything more than that the bulge was "hard", which itself strains credulity, is not surprising. However, even the inadvertent touching of a hard object does not, absent information linking the suspect to the possession of a weapon, or exigent circumstances, justify a subsequent frisk of the suspect. *(People v Sanchez,* 38 NY2d 72, 73.) Defendant's motion to suppress the cocaine should have been granted.

Accordingly, the judgment of the Supreme Court, New York County (Clifford Scott, J., at suppression hearing, plea and sentence), rendered April 2, 1987, convicting defendant, upon a plea of guilty, of criminal possession of a controlled substance in the second degree, and sentencing him to an indeterminate term of imprisonment of six years to life, is reversed, on the law, and in the exercise of discretion in the interest of justice, the motion for suppression granted and the indictment dismissed.

SANDLER, J. (dissenting). I am in agreement with Justice Carro, for the reasons set forth in his opinion, that this court has the right, in the interests of justice, to reach the merits of the issue presented by the hearing court's denial of the motion to suppress, and should do so.

As to the merits of the issue, although a very close question is presented, I believe that the totality of circumstances justified the conclusion of the police officers that there was reasonable suspicion that the defendant was engaged in a criminal activity, and that he might possess a weapon.

ROSENBERGER and SMITH, JJ., concur with CARRO, J.; KUPFERMAN, J. P., and SANDLER, J., dissent in an opinion by SANDLER, J.

Judgment, Supreme Court, New York County, rendered on April 2, 1987, reversed, on the law, and in the exercise of discretion in the interest of justice, the motion for suppression granted and the indictment dismissed.