■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v LATISHA BOWDEN, Respondent. [928 NYS2d 12]—

The hearing court erred in suppressing the physical evidence and defendant's statements. Based upon the testimony of the sole witness, Sergeant Robert Barnett, whose testimony the hearing court properly credited in its entirety, every aspect of the police conduct was properly justified by their observations and the information in their possession.

After taking into custody a man who was wanted in connection with a shooting incident, and receiving from that man insufficient identification and conflicting information both as to his name, which he initially gave as Jason Lawyer, and as to his address, the police determined that on a previous occasion they had arrested a man by the name of Joshua Lawyer with an address of 328 East 197th Street, apartment 4C. In order to confirm the arrested individual's identifying information, Sergeant Barnett and three other police officers went to apartment 4C at 328 East 197th Street in Manhattan, on June 28, 2008, at 2:30 A.M. When the police knocked at the apartment door, a female voice asked who was there, and the Sergeant said "It's the police. Can I have a word with you?" When Sergeant Barnett heard scuffling noises followed by the sound of a window being opened, he sent two of the officers up to the roof of the building. Those two officers reported afterward to the Sergeant that once on the roof, they observed a figure emerge from a fourth-floor window and ascend the building's fire escape to the roof, with an object in hand. Once the individual arrived

on the roof, one of the officers announced "Police. Don't move."* The individual dropped a bag, which landed with a loud thud. One officer detained the individual, identified at the hearing as defendant, and the other retrieved the dropped bag, which was made of canvas. Through the fabric of the bag the officer who picked it up could feel an L-shaped, hard object causing him to conclude that it was a gun. In fact, when he opened the bag, he found a loaded pistol as well as a magazine and five rounds within another bag contained within the outer bag.

It is true that the police did not initially have any information about the apartment's contents or its occupants when they first approached the apartment, except that the accused perpetrator of a shooting might have lived there. It is also true that individuals of whom the police have no reasonable suspicion of criminal activity have the right not to answer an officer's question, or even to run from the police, without those acts creating grounds to detain that individual (see People v May, 81 NY2d 725, 728 [1992]; People v Howard, 50 NY2d 583, 586 [1980], cert denied 449 US 1023 [1980]). However, we reject the dissent's view that the police had insufficient grounds to detain defendant by the time she arrived on the roof. Rather, we conclude that the totality of the information known to the police by the time defendant was observed on the roof holding the bag was sufficient to create a reasonable suspicion that defendant was involved in some criminal activity, entitling them, under People v De Bour (40 NY2d 210, 223 [1976]), to detain her and pat down the canvas bag she had dropped.

In People v Howard, the police had approached a man on the street, having no prior information regarding his criminal activity, merely because he was holding a vanity case and purportedly looking "furtive," and they detained him when they caught up to him after he ran from them (50 NY2d at 587). Similarly, in People v May, the police detained two people based on their being seated in a parked automobile on a deserted street at 2:30 A.M., and detained them after they drove off when the police approached. Here, in contrast, the police did not begin with no information at all; rather, the apartment in question was the possible address of a man charged with a shooting. When the apartment's occupant attempted to flee rather than respond to

---

* There is no evidence at all that the police directed or instructed the individual to drop the bag. After Sergeant Barnett testified on direct examination that the officers said, "Police. Don't move," on cross-examination defense counsel asked, "And they tell the individual to drop it, correct? Drop the bag?" When the witness merely said, "I'm not sure exactly what they said. I know they said police, don't move," defense counsel rephrased his question, to "They said police don't move, correct?" which the witness confirmed.

the police when they arrived at the door, although that fact alone did not give them the right to detain defendant, they had no obligation to simply allow her to flee; they were entitled to pursue her, as in *People v May*, where the Court observed that although the officers had no legal basis to stop the car when they did, they could have followed the car and run the plates to determine whether it was stolen (81 NY2d at 728).

The officers' observations of defendant holding an object as she exited her apartment through the window and climbed up the fire escape to the roof, when considered together with the information that had led them to the apartment in the first place, provided justification for the police to identify themselves as police and direct her to stop once she reached the roof. By that point, their observations and the information known to them had risen to the level of a reasonable suspicion that defendant had been or was then engaged in criminal activity, specifically, that she was trying to avoid the police's detection of some contraband, possibly relating to the shooting underlying their initial approach to the apartment. This information justified a stop and frisk under *People v De Bour*.

There are certainly similarities between these circumstances and those in *People v Singh* (291 AD2d 419 [2002], *lv denied* 98 NY2d 655 [2002]), where police went to an apartment based on an anonymous tip of drugs contained there and received unresponsive answers from behind an apartment door, after which the apartment occupant attempted to flee by jumping out a second floor window and off the roof of a shed. However, due to the *Singh* decisions's mixing of language applicable to *De Bour* level-two stops and that applicable to *De Bour* level-three stops, particularly since the *Singh* decision relied on cases where level-three stops were found to be justified, we decline to rely on *Singh* for the conclusion that only a level two right of inquiry was created there by the information possessed by the police. It is worth noting, however, that unlike the facts in *Singh*, the underlying investigation here concerned an actual shooting, not an anonymous report of drug possession; this element necessarily creates in the minds of the investigating officers the constant spectre that a weapon might be uncovered in the course of investigation.

Having properly detained defendant, there was no impropriety in the officer's "frisk" or "patdown" of the bag. It was in defendant's "grabbable area" at the time of the stop, it was retrieved moments after defendant was detained, and the thud it made upon being dropped as well as the connection between the apartment and the shooting suspect gave the officers

grounds to "pat down" the bag (*see Matter of Gregory M.*, 82 NY2d 588, 591 [1993]; *People v Brooks*, 65 NY2d 1021, 1023 [1985]; *People v Corbett*, 258 AD2d 254, 255 [1999], *lv denied* 93 NY2d 898 [1999]). The testimony that defendant was "secured" before the bag was frisked did not render the frisk of the bag improper (*see People v Smith*, 59 NY2d 454 [1983]; *People v Wylie*, 244 AD2d 247 [1997], *lv denied* 91 NY2d 946 [1998]). Nor does it matter that Sergeant Barnett did not testify that the officers were concerned for their safety at the time defendant was detained and her bag patted down; that they had reason to suspect the presence of a gun at that moment is enough (*People v Fernandez*, 88 AD2d 536 [1982]).

The hearing court's reliance on *People v Gokey* (60 NY2d 309 [1983]) was misplaced. *Gokey* stands for the proposition that the police may not perform a warrantless *search* of a duffel bag simply because it had been within the grabbable area of a suspect at the time of his arrest (*id.*). Importantly, in *Gokey* there was no concern about a gun, and the Court observed that the police left the bag on the ground when they arrested the defendant, indicating a lack of any sense of exigency (*id.* at 311). *Gokey* does not deal with circumstances in which police, upon taking hold of a defendant's bag immediately after detaining that defendant, have reason to be concerned that it contains a gun, and upon palpation, can feel the presence of a gun within.

When, upon feeling the contents of the bag, the officer felt the distinctive weight and L-shape of a firearm, he was justified in searching the bag (*see People v Prochilo*, 41 NY2d 759, 762 [1977]; *People v Corbett*, 258 AD2d at 255). Accordingly, the gun contained in the bag and defendant's subsequent statements were lawfully obtained. Concur—Andrias, Saxe and Manzanet-Daniels, JJ.

Tom, J.P., and Freedman, J., dissent in a memorandum by Tom, J.P., as follows: Supreme Court properly suppressed a handgun and ammunition recovered from a bag defendant Latisha Bowden dropped upon being detained at gunpoint by police. While her activities provided a founded suspicion that criminality was afoot so as to warrant the exercise of the common-law right to inquire, they fell short of providing the reasonable suspicion that defendant was committing or about to commit a crime necessary to support a forcible stop and detention that might have justified the warrantless search of her effects (*People v De Bour*, 40 NY2d 210, 223 [1976]).

At a combined *Huntley/Dunaway/Mapp* hearing, the court heard testimony from a single witness, Sergeant Robert Barnett, who was the supervisor of a team consisting of four officers who

went to 328 East 197th Street in Manhattan in the early morning of June 28, 2008, arriving at approximately 2:30 A.M. In connection with an investigation into a shooting, the team had arrested one Joshua Lawyer, who was being held on a charge of attempted murder. Because Lawyer had provided them with more than one name and one address, the Sergeant explained, their purpose in going to the East 197th Street location was "to verify he was indeed who he said he was." When Sergeant Barnett, accompanied by his three fellow officers, knocked on the door of apartment 4C, a female voice quietly asked who was there. After informing her that he was the police, the Sergeant heard "scuffling noises" followed by "the sound of a window opening up. It's very distinct." He instructed Officers Emhardth and Urquiaga to go to the roof while he ran downstairs, leaving Officer Smith at the apartment door.

Officer Urquiaga later reported to Sergeant Barnett what had transpired on the roof, which the Sergeant related at the hearing. Officer Urquiaga had observed a "dark figure" emerge from a fourth-floor window carrying "an object" and begin to ascend the fire escape. He and Officer Emhardth took cover, drew their weapons and waited. As the figure appeared on the roof, Officer Urquiaga said, "Police. Don't move," and the person, later identified as defendant, dropped the bag, which landed with "a loud thud."[1] Although it was dark on the roof, both officers used their flashlights.

Officer Urquiaga, without making any inquiry, placed defendant in custody and handed her off to Officer Emhardth,[2] at which point she was "secured." Officer Urquiaga then retrieved the bag, which was made out of canvas and contained something heavy. He felt or "frisked" the bottom of the bag and detected an L-shaped, metal object which, based on his training and experience, he believed to be a gun. He opened the canvas bag and found that it contained yet another bag, which he also opened, revealing a ".45 caliber firearm. Next to it was a clip and magazine. And next to that were five live .45 caliber rounds."

Officer Urquiaga then asked defendant what she was doing on the roof, to which she replied that "she had this bag and she had—it didn't belong in her house, and she had to get it out of her house." Defendant was placed under arrest and transported to the 48th Precinct. While en route, she made a second state-

1. Sergeant Barnett did not know whether the officers told defendant to drop the bag, stating, "I'm not sure exactly what they said. I know they said police, don't move."

2. Sergeant Barnett was not sure whether defendant was already in handcuffs at the time Officer Urquiaga passed her off to Officer Emhardth.

ment that she had not been aware of what was in the bag and that she thought it was a paperweight or some other kind of weight. At the precinct, at about 4:00 A.M., she received *Miranda* warnings and gave a written statement.

The court found that the officers were justified in "pursuing Defendant onto the roof and stopping and detaining her on the roof." The court nevertheless suppressed the contents of the bag concluding that "there was no evidence or testimony of exigency or police safety that would tip the scales away from preserving Defendant's right to privacy" (citing *People v Smith*, 59 NY2d 454, 458 [1983]). The court reasoned that "once Defendant was secured by the police, no exigency or safety issues existed that would necessitate the police officer's 'frisk' of the bag" (citing *People v Gokey*, 60 NY2d 309, 311 [1983]). Because the illegal search was the predicate for defendant's arrest, the court held that the arrest was without legal basis and therefore suppressed both the statement made by defendant in the police car and her subsequent written statement.

On the People's motion for reargument, the court rejected their contentions that defendant had abandoned the bag and that the police had a legitimate, though unarticulated concern for their safety, finding that they were not at the apartment to investigate a violent crime because they already had the shooter in custody. Additionally, the court noted that there was no testimony concerning any threat to the officers' safety, the bag was not within defendant's grabbable area, and defendant was already in custody and secured before the bag was retrieved and inspected.

On their appeal, the People contend that since the forcible detention of defendant was found to have been "wholly proper" by the hearing court, this Court is foreclosed from considering the issue. They argue that the ruling is not adverse to the prosecution and forms no part of their appeal because the People are not aggrieved by it (CPLR 5511; citing *People v Goodfriend*, 64 NY2d 695 [1984]). The People therefore do not attempt to justify the detention, but proceed on the theory that since defendant's forcible detention was found "wholly proper," the only question for this Court's consideration is whether the "frisk" of the bag was justified. Specifically, the People suggest that the officers entertained legitimate concerns that defendant might have access to a weapon, which might pose a risk both to themselves and members of the public if not secured.

There is no question that the right to frisk is ancillary to a forcible stop and detention. "A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if

the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed" (*De Bour*, 40 NY2d at 223). However, the right accrues only where the circumstances provide "reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (*id.*; *see People v Ventura*, 139 AD2d 196, 206 [1988]). Thus, whether the extent of the intrusion upon defendant's liberty by the arresting officers was justified under the circumstances is a question central to this appeal.

It should require no repetition that New York recognizes four levels of official interference with an individual's liberty. The request for information is the most minimal and requires only "some objective credible reason" to approach the individual that does not necessarily implicate criminal conduct (*De Bour*, 40 NY2d at 223). Second is the common-law right to inquire, which permits interference to the extent necessary to gain explanatory information and requires "a founded suspicion that criminal activity is afoot" (*id.*). Third is a forcible stop and detention, which is only permissible when there is *reasonable suspicion* that a specific individual "has committed, is committing or is about to commit a felony or misdemeanor" (*id.*). By statute, an officer making a forcible stop has authority to conduct a frisk if a reasonable threat of physical injury is presented (CPL 140.50 [3]). Finally, an officer may arrest an individual if there is probable cause to believe he or she "has committed a crime, or offense in his presence" (*De Bour*, 40 NY2d at 223).

In holding that the pursuit and detention of defendant on the roof by the arresting officers was proper, the hearing court cited to *People v Singh* (291 AD2d 419 [2002], *lv denied* 98 NY2d 655 [2002]). Significantly, *Singh* holds only that a defendant's unresponsive and peculiar answers from behind the closed door of an apartment, together with his attempt to flee by exiting through a second-floor window and jumping off a shed roof afforded police "with reasonable suspicion that criminal activity was afoot" (*id.* at 420), a second-level encounter under *De Bour*. Thus, *Singh* does not support the hearing court's finding of a proper forcible stop, a third-level interference. It is well settled, however, that reasonable suspicion of criminal activity supports only the common-law right to inquire, warranting official interference "to the extent necessary to gain explanatory information, but short of a forcible seizure" (*De Bour*, 40 NY2d at 223). In the matter under review, the hearing court went on to suppress the physical evidence, concluding that while "the facts at issue demonstrate that the police had reasonable suspicion to

secure Defendant and inquire further, they did not make further inquiry until <u>after</u> the bag had been searched."

It is significant that the hearing court did not consider the circumstances sufficient to justify a forcible stop and detention; it simply found the detention of defendant by the officers to have been justified by their need to obtain an explanation for her conduct. This is clearly an erroneous conclusion. While the common-law right to inquire permits police greater latitude to interfere with the individual's freedom than a mere request for information, the level of interference must remain "short of a forcible seizure" (*id.*). Since the officers' confrontation with defendant can only be characterized as a forcible stop and detention, the court clearly erred in finding it to have been justified by the need to obtain explanatory information.

The People identify no information available to the officers prior to the time the bag was searched that would have led a reasonable person to conclude that defendant was involved in the crimes of which she is accused. The People concede that the officers went to defendant's apartment ostensibly to ascertain the identity of a person already held in custody in connection with a shooting. In any event, Sergeant Barnett testified that at the time the officers arrived at the location, they had no reason to believe that defendant was in any way connected with the crime they were investigating. The majority purports to justify the forcible seizure of defendant by stating that because the officers observed defendant holding an object while exiting the window of her apartment and climbing up the fire escape to the roof, there was "reasonable suspicion that defendant had been or was then engaged in criminal activity, specifically, that she was trying to avoid the police's detection of some contraband possibly relating to the shooting." This is pure speculation after the fact by the majority and not supported by the testimony of Sergeant Barnett. In fact, the two officers who confronted defendant on the roof did not testify and could not have intimated their belief that defendant was engaged in any criminal activity let alone disposing of contraband related to the shooting as suggested by the majority. The officers had no idea who defendant was or her connection, if any, to the suspect in custody. There is no evidentiary support for the majority's theory. Defendant's detention is supported only by her act of leaving her apartment by a window carrying some object, climbing up the fire escape and emerging onto the roof, whereupon she was met by two officers with weapons drawn, dropped the bag—either as directed or in response to illegal police action (*People v Ramirez-Portoreal*, 88 NY2d 99, 110 [1996]; *see also People v Grant*, 164

AD2d 170, 175-176 [1990], *appeal dismissed* 77 NY2d 926 [1991]; *cf. People v Reyes*, 199 AD2d 153, 154 [1993], *affd* 83 NY2d 945 [1994], *cert denied* 513 US 991 [1994])—and was placed in handcuffs.

Even if defendant's flight under the circumstances could be said to have afforded the officers with "founded suspicion that criminal activity is afoot," a second level confrontation (*De Bour*, 40 NY2d at 223), the permissible interference by the officers is limited to the common-law right to inquire and gain explanatory information, and does not extend to the immediate forcible detention of defendant and the search of her bag.

In assessing the constitutionality of official intrusion upon the security and privacy of the individual, *De Bour* requires that the reasonableness of each level of interference with an individual's liberty of movement be assessed in view of the knowledge possessed by police at that particular moment (*De Bour* at 216-217). The majority instead adopts the amorphous standard of "the totality of the circumstances" and proceeds to "justify a stop by subsequently acquired suspicion resulting from the stop" (*id.* at 215-216). Such post hoc rationalization was expressly rejected by the Court of Appeals, which noted that its "reasoning is the same which refuses to validate a search by what it produces" (*id.* at 216). The majority nevertheless upholds the subject search even though the circumstances that led the apprehending officers to become aware of the weapon they recovered did not begin to unfold until after defendant had been forcibly confronted and detained.

The holding in *People v Howard* (50 NY2d 583, 587 [1980], *cert denied* 449 US 1023 [1980]) is instructive in the disposition of this appeal. There, the curiosity of two plainclothes police officers was aroused when they observed Howard carrying a woman's vanity case and looking "furtive." When they drove by in an unmarked car, one of the officers displayed his shield and asked to speak to him. Howard ignored the request and, when the officers persisted, ran away, clutching the vanity case to his chest. The officers gave chase on foot and pursued him into the basement of a building. Cornered, Howard discarded the case. One of the officers recovered the case and opened it, revealing a .38 caliber handgun and packets of heroin. Howard was then arrested.

The Court of Appeals held that while the police officers had a reasonable basis to approach Howard and question him, "there was nothing that made permissible any greater level of intrusion" (*id.* at 590). The Court noted that Howard "had a constitutional right not to respond" (*id.*). "Nor can the failure

to stop or co-operate by identifying oneself or answering questions be the predicate for an arrest absent other circumstances constituting probable cause" (*id.* at 591-592). The Court added that officers are not prevented from conducting further "observation provided that they do so unobtrusively and do not limit defendant's freedom of movement by so doing" (*id.* at 592). As to flight, "where, as here, there is nothing to establish that a crime has been or is being committed, flight, like refusal to answer, is an insufficient basis for seizure or for the limited detention that is involved in pursuit" (*id.*). The Court concluded: "The circumstances existing at the moment defendant Howard was seized . . . did not constitute probable cause for arrest. The opening of the vanity case cannot be justified as incident to a lawful arrest, nor since it was as the Trial Judge found outside the grabbable area can it be justified under CPL 140.50 (subd 3). The contents of the vanity case must, therefore, be suppressed unless defendant abandoned it" (*id.*). Because the hearing court had found that Howard's act of keeping a firm hold on "the case during the entire chase belies intention to abandon" (*id.* at 593), it granted the defendant's motion to suppress and dismissed the indictment against him.

In the matter at bar, defendant was confronted by police not on the street but in her own home, the place to which Fourth Amendment protection against unreasonable search and seizure finds particular application (*see Silverman v United States*, 365 US 505, 511 [1961]). A person approached in her home has no less "a constitutional right not to respond . . . [, to] remain silent or walk or run away" (*Howard*, 50 NY2d at 586). Nor may officers "pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away" (*id.*; *cf. People v Jenkins*, 209 AD2d 164, 165 [1994]).

To prevail on their claim that the "frisk" of the bag carried by defendant was justified, the People must demonstrate reasonable suspicion that defendant was involved in the commission of a crime (*see People v May*, 81 NY2d 725, 727 [1992]), thereby authorizing a forcible detention, and that the officers reasonably suspected that they were in danger of physical injury by virtue of the detainee being armed (*De Bour*, 40 NY2d at 223). When Sergeant Barnett first spoke to defendant through her apartment door, he concededly had no more than an "objective credible reason" to request information (*id.*). The prosecution argued at the suppression hearing that defendant's flight from the apartment established "founded suspicion," in direct

contravention to *Howard*, which holds that flight does not afford justification for pursuit.

Finally, the People argued that the sound made by the bag when defendant dropped it provided the officers with reasonable suspicion and the basis to conduct a "frisk" of the bag. However, defendant had already been forcibly seized (at gunpoint) at the time Officer Urquiaga heard the "thud" arousing his suspicion as to what the bag might contain. Defendant was secured (in handcuffs) and handed off to an officer by the time the other officer began to search the bag, and the People have identified nothing up to that point that would connect defendant with the commission of any crime or subject the officers to the threat of physical injury. Contrary to the People's contention at the hearing, defendant clearly had standing to contest the search of the bag, as reflected by the factors of possession, privacy and exclusive access. As stated in *People v Ramirez-Portoreal* (88 NY2d at 111), defendant "was in actual and sole possession of it. The bag was closed, evincing an effort to maintain the privacy it afforded." Here, defendant was in actual possession of the bag and was holding it when she was induced to drop it. The police then forcibly detained defendant and, without making any inquiry to obtain information to suggest the commission of a crime, began to search the bag, a clear violation of the permissible level of interference under *De Bour*. Finally, defendant's subsequent statement that the contents of the bag did not belong in the apartment "does not necessarily indicate that [s]he lacked the right to exclude others from access to it" (*Ramirez-Portoreal*, 88 NY2d at 111-112). The bag had been kept in defendant's apartment, and there is no evidence to indicate that any other person was provided with access.

Accordingly, the order granting suppression should be affirmed. **[Prior Case History: 27 Misc 3d 1203(A), 2010 NY Slip Op 50538(U).]**